Filed 2/21/23  In re Solina S. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re SOLINA S., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>　　Plaintiff and Respondent,<br>v.<br>TIFFANY K.,<br>　　Defendant and Appellant. | A164998<br><br>(Marin County Super. Ct. No. JV27178A) |

This is an appeal by Tiffany K. (mother) from the juvenile court's jurisdiction and disposition orders in dependency proceedings involving her infant daughter, Solina S. (minor), born in August 2021.  Mother contends the juvenile court erred in finding jurisdiction over minor and then removing minor from mother's custody at the jurisdiction/disposition hearing.  We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

## I. *The Petition.*

On December 17, 2021, a petition was filed under Welfare and Institutions Code[1] section 300, subdivision (a), alleging that, on December 15, 2021, mother placed minor at a substantial risk of serious physical harm inflicted nonaccidentally.[2] The petition further alleged, under section 300, subdivision (b)(1), that minor had suffered or faced a substantial risk of suffering serious physical harm or illness due to mother's inability to provide regular care for minor due to her mental health issues. According to this petition, on December 15, 2021, mother was driving with minor, who was unsecured in the front seat of a stolen vehicle, when the car became stuck on train tracks. Mother and minor left the car and wandered around for several hours in 40-degree weather. Minor was dressed only in a onesie and wrapped in a towel. Mother was shoeless, dressed in a plastic poncho and shorts. At some point, mother entered a bar with minor, speaking nonsensically. Mother was arrested for felony child abuse, and minor was taken to a nearby hospital and then into protective custody. Mother initially told police that she was an undercover agent and denied knowing minor's identity.

## II. *Detention.*

The department filed a report in anticipation of the detention hearing. The report stated the following: On December 14, 2021, about 2:00 a.m., a San Rafael police officer observed mother at a bus stop with a baby stroller.

---

[1] Unless otherwise stated, all statutory citations herein are to the Welfare and Institutions Code.

[2] Allegations were also made against minor's alleged father, Gregory S. (alleged father), pursuant to section 300, subdivisions (b) and (g). Alleged father is not a party to this appeal. Accordingly, we address the allegations against him only in passing.

The officer noted the odd time but did not approach mother. The next evening, the San Rafael Police Department received a report that a vehicle was stolen by a person matching mother's description. The owners witnessed mother pulling out of their driveway in their vehicle at a high rate of speed. This stolen vehicle was later found abandoned on railroad tracks, with the door open.

About 1:20 a.m. on December 15, 2021, half a mile from the tracks where the stolen car was abandoned, mother, minimally dressed and without shoes despite 40-degree weather, entered a bar carrying minor, who was wearing only a onesie and a diaper. Minor's diaper was soiled and had feces spilling out. Bar personnel cleaned up minor, who was cold and wet, and wrapped her in a towel. Mother told them she found minor abandoned in the vehicle. When the police arrived later, mother acknowledged minor was hers but insisted that she was working undercover and that minor's father was trying to kill them. The officers found outstanding warrants for mother's arrest[3] and, additionally, arrested her for child endangerment. They placed minor into protective custody and transported her to a local hospital, where she was found cold and hungry but otherwise healthy.

After mother's arrest, the department's social worker (Lowe) met with her at the county jail and found her statements unclear and disorganized. Mother initially denied knowing the identity of minor's father but then stated that she was romantically involved with two men, alleged father and S.P. However, alleged father acknowledged his parentage on minor's birth certificate while mother was recovering from a cesarean section. Mother

---

[3] Mother had two outstanding arrest warrants for violations of Penal Code sections 597.7, subdivision (a), great bodily injury to an animal, and 597, subdivision (b), animal cruelty.

stated that she was seeking sole custody of minor and had a restraining order against alleged father due to his past violence against her. It was mother's fear for minor's safety that led her to enter the bar with minor, after a friend messaged her on social media to say her "ex-boyfriend" was coming to kill mother and minor. Mother further explained that she did not intend to steal the vehicle until she saw men watching and pointing at her. Mother insisted that as she drove with minor on her lap, her seatbelt covered both of them. Mother also stated that she could not see where she was driving because she did not have her glasses. Mother left the car on the train tracks and entered the bar because she was worried that it was too cold for minor in the car.

Mother also reported to Lowe that she was diagnosed with postpartum depression and was prescribed Zoloft. She claimed the medication made her feel anxious. She denied other mental health issues. However, mother's sister later told the department that mother had ongoing mental health issues and was hospitalized in a psychiatric hospital at least twice about a decade earlier. Mother's sister denied having concerns about mother's ability to care for her children, but she did not know whether mother was using alcohol or drugs. She also acknowledged that mother " 'acts crazy [when she] is triggered by something.' "

On December 17, 2021, social worker Montero received nine text messages from mother in the early morning hours that were "difficult to discern." Mother seemed to indicate that she stole the car to protect minor from alleged father and asked Montero to come to her home for an emergency visit and assistance with having minor returned to her care.

A detention hearing was held December 20, 2021. Afterward, the court ordered minor detained and ordered supervised visitation for mother.

III.    *Jurisdiction and Disposition.*

On January 25, 2022, the jurisdiction hearing began.  The court preliminarily addressed mother's application for a restraining order, in which she declared under penalty of perjury that alleged father pushed her into a wall while she was holding minor, fracturing mother's hip and left hand.  The court denied mother's application after finding no evidence to support her claims, and vacated the temporary restraining order that had already been imposed against alleged father.  The matter was then continued to February 2022.

A.    **Prior Referrals Involving Minor.**

On February 10, 2022, the department filed a first amended jurisdiction report noting, inter alia, that it received five referrals concerning minor's safety prior to her recent detention.  As to the first of these referrals, in August 2021, three days after minor's birth, the department received a report that mother's mental health issues, including paranoia, were impeding her ability to care for minor.  According to this report, mother left the hospital against medical advice after minor's premature birth and refused to have minor treated for herpes after mother tested positive for the condition.  Mother also refused a psychiatric evaluation that was ordered after she gave physicians conflicting reports of her current mental health diagnoses.  Of particular concern, minor tested positive for a heart anomaly at birth, requiring follow-up with a cardiologist.  Yet, mother refused to set up the follow-up appointment and to discuss the issue with hospital staff.  Mother also pulled minor out of the hospital's mandatory car seat safety study.

The investigating social worker spoke to mother's case manager at Sausal Creek Outpatient Clinic (Sausal Creek) in Oakland, where mother had been a client since May 2020.  The case manager reported mother was

5

not currently engaged in mental health care but that she was well known to Sausal Creek staff. The case manager described mother as "hot and cold," with labile moods. She would disengage from care then call the clinic multiple times per day, insisting on speaking to her doctor for a "medical emergency" that was not necessarily an emergency. She routinely yelled and screamed at staff and demanded a new provider.

Mother was prescribed Latuda and olanzapine at Sausal Creek. When mother became pregnant, she was advised that it was safe to take sertraline. However, the case manager later learned mother decided against taking medication while pregnant. Mother was diagnosed with bipolar disorder in 2019, and according to the case manager, she may also have a "character/personality disorder." The case manager also observed symptoms of mood disturbance and was concerned that mother's high irritability could create risk of physical harm to minor should mother become frustrated. The case manager opined that mother will need monitoring until she learns to perform the tasks and manage the normal stressors of motherhood. Mother would also need to take her prescribed medications and may need additional medication for her bipolar disorder symptoms.[4]

This referral was ultimately closed as inconclusive for general neglect. When the investigating social worker made contact with mother, mother seemed stable and oriented and had followed up appropriately with support services and minor's medical care.

On September 20, 2021, the department began another investigation, after mother reported that alleged father pushed her while she held minor

_____

[4] Sausal Creek later provided a letter to the court stating that mother's diagnosis as of April 20, 2019, was "F31.9 Bipolar Disorder, Unspecified," and her medication, last prescribed on August 20, 2021, was 100 milligrams sertraline.

and, another time, yelled, swore, and kicked objects in minor's presence. Mother also reported that she and alleged father were no longer a couple and that she was working with the Center for Domestic Peace to keep herself and minor safe from him.

Between October 27, 2021, and November 25, 2021, the department received three additional reports concerning minor's safety in mother's care. The reporters warned that mother's mental health compromised her ability to care for minor and that mother was unwilling to listen to medical providers' advice on caring for minor. Mother brought minor to an emergency department, stating that minor was choking and could not breathe and that she was scheduled for cardiac surgery. However, medical personnel found no surgery or medical procedure scheduled for minor and did not observe the symptoms in minor that mother described. Another reporter described an incident on November 25, 2021, when mother stated that minor was due for surgery that day but that alleged father had kidnapped minor and had physically abused and threatened to kill mother and minor. Mother also told the reporter that alleged father touched minor in a sexually inappropriate way. Ultimately, however, none of mother's claims about alleged father were substantiated.

### B. Additional Information Regarding Mother's Mental and Physical Health.

The department gathered the following additional information regarding mother's health. In August 2021, two days before minor's birth, mother was diagnosed with preeclampsia and was told she should return for treatment because preeclampsia could endanger both mother and child. Yet, mother refused treatment, apparently because alleged father could not join her at the hospital due to COVID-19 restrictions.

After minor's birth, mother reported feeling anxious when minor cried and feeling "triggered" during the car seat test. Yet, mother did not disclose her psychotropic medications to the medical personnel at the hospital and refused their recommended psychiatric evaluation.

On October 15, 2021, mother contacted Marin Community Clinic (MCC) for a medication evaluation to manage her anxiety, depression, and self-reported misuse of alcohol and marijuana. Mother reported frustration and increased anxiety since minor's birth. According to the treating nurse practitioner's notes, mother, before taking her prescribed medication, was talking to light sockets and walls, having anxiety attacks, and crying frequently. Mother reported that her sertraline dosage had increased from 50 milligrams to 100 milligrams but that she was " 'trippin on those 100s.' " Mother, living in a Homeward Bound of Marin shelter, cited numerous stressors, including homelessness, deaths of family members, and the activities of daily living. She was told to take 50 milligrams of sertraline per day for anxiety, with a plan to increase this dosage to 75 milligrams, and to "continue psychotherapy."

On November 16, 2021, mother again contacted MCC, "at the request of her primary physician," seeking help with anxiety and depression. Mother reported that her anxiety had worsened and that she was using alcohol and marijuana to cope with symptoms that included dizziness, lightheadedness, nausea, hunger, and fear. Her treating behavioral health practitioner recommended cognitive behavioral therapy and introduced various mindfulness and relaxation techniques. Mother stated she was not interested in therapy but requested support with the mindfulness and relaxation techniques. Mother denied any other mental health issues or diagnoses aside from having to attend an anger management class related to

a domestic violence incident about eight years prior. Mother subsequently did not attend her one-month follow-up appointment and, aside from attending a therapy session in mid-November 2021 for anxiety, was "unreachable" by MCC through December 2021. After mother missed her follow-up appointment, her sertraline prescription was "not changed or renewed." Then, in late December 2021, psychiatric nurse practitioner Sanders, mother's treating nurse practitioner, learned that mother had requested an Invega injection, which surprised Sanders because patients with anxiety, depression, or posttraumatic stress disorder do not usually know what Invega is, as Invega patients need a higher level of care. After repeated efforts to reach mother, MCC was finally able to reach her on February 8, 2022. Mother then informed MCC personnel that she was receiving Invega injections through Marin County Behavioral Health and Recovery Services.

The department also received information that on December 17, 2021, two days after minor's removal, mother was placed on a section 5150 involuntary psychiatric hold that was expected to be extended to a section 5250 hold. According to the Marin County mobile crisis response team, mother was exhibiting psychotic symptoms that were becoming delusions, was not taking her medication, and could not take care of herself. Mother was discharged from the psychiatric hold on December 23, 2021.

MarinHealth Medical Center (MHMC) provided records from mother's psychiatric hold indicating that on November 26, 2021, mother received domestic violence resources at MHMC's emergency department after reporting that she was "attacked" by her partner. In addition, records indicated that mother was previously diagnosed with schizophrenia and bipolar disorder and had a history of compulsive cleaning behavior, "cutting"

9

behavior, delusions, paranoia, hallucinations, and functional impairments. Mother reported she stopped driving one year prior due to anxiety. She also reported that she did not take her medications while pregnant because " 'they told her to,' " but she did not say who " 'they' " were or where she received her medications. Mother acknowledged another psychiatric hospitalization in the past two years and 10 psychiatric hospitalizations in her lifetime. In addition to MHMC, mother received mental health care from the Bridge team in Marin County in November 2021 and from various providers in Oakland over the years for anxiety, depression, and obsessive-compulsive disorder.

When mother was discharged from the recent psychiatric hold, her physician noted that mother became psychotic and manic while taking Zoloft without a mood stabilizer, due to her bipolar disorder. Mother also presented with low thyroid stimulating hormone, which could have contributed to her manic episodes. Mother was released with numerous prescribed medications, including paliperidone (for psychosis and mood stabilization), Depakote (for mood stabilization), and quetiapine (Seroquel) (for agitation and psychosis). In addition, while hospitalized, she received an injection of Invega for psychosis and mood stabilization, and she was due for her next injection on December 29, 2021.

In January 2022, department social worker Rosas spoke multiple times with Gabriel Robinson, mother's mental health social worker at Marin County Behavioral Health and Recovery Services. Robinson opined that mother was wrongly given Zoloft, as a person with bipolar disorder should not be given antidepressants. Robinson also stated that mother told him she had agoraphobia, anxiety, and postpartum depression and was afraid to go outside for fear of being attacked. Gospel music helped her regulate her mood.

10

Rosas also reported that, on January 6, 2022, mother told her that she gave minor medicine, specifically Mucinex, every time minor went outside. Rosas later confirmed Mucinex was contraindicated for children under age four.

Rosas further reported that mother agreed to substance abuse treatment after self-reporting substance abuse issues. However, on January 19, 2022, mother cried when the topic of treatment was brought up. Mother insisted she did not need treatment and had never heard anything about it. On January 29, February 3, and February 5, 2022, mother failed to show up for scheduled drug testing.

Rosas spoke to both alleged father and mother regarding the alleged incident of domestic violence on November 26, 2021, when mother called the police to report that alleged father pushed her. Alleged father was arrested, and a temporary restraining order was imposed against him. However, alleged father denied ever being physically aggressive with mother and later applied for a restraining order against mother, insisting she was making false claims.

Ultimately, the department recommended that minor remain out of the home and parents receive reunification services. Rosas noted that mother appeared to function well at the executive level, as she was resourceful and capable of obtaining information and services for herself and minor. However, mother's cognitive functioning was limited, mother "played loose" with the truth, and mother failed to acknowledge that her actions placed minor at risk of serious harm or death. The department thus concluded: "[I]t is paramount that services including a psychological evaluation, psychotropic medication/monitoring, therapy, substance abuse assessment, and parenting

11

education are necessary for [mother] to demonstrate that she can be the safe caregiver that [minor] needs and deserves."

## C. The February 2022 Hearing and Order.

At the February 2022 hearing, mother's Homeward Bound of Marin case manager, Johanna Hernandez, and her mental health social worker, Gabriel Robinson, testified on her behalf. Hernandez described visiting mother several times a week to assist her with housing and related services. Among other things, Hernandez helped mother stay on top of her medicine and medical appointments and connected her to other services as needed. Hernandez also helped mother create a safety plan. She found mother's residence clean and well stocked with supplies for minor. Further, she described mother as goal-oriented and normal. Yet, on cross-examination, Hernandez acknowledged only being aware of mother's anxiety and not of any of her other mental health concerns.

Robinson testified that he had been providing mother with clinical case management services for about six or seven weeks and spoke to her, mostly by phone, two to four times weekly. Robinson observed behavior in mother that could be indicative of either hypomania or generalized anxiety disorder. To him, mother's symptoms appeared somewhat improved. Robinson was aware of mother's bipolar disorder diagnosis but was not aware of her prescribed medications or whether she was medication-compliant.

In addition to confirming information set forth in the department's reports, Rosas testified that mother was a patient of Pathways to Wellness from 2015 to 2018 and, according to the organization's records, she was diagnosed with schizophrenia. Among mother's reported mental health symptoms were auditory hallucinations, seeing frogs and rabbits, restlessness, anxiety, depression and paranoia.

12

On March 1, 2022, the juvenile court sustained the allegations as to both section 300, subdivision (a) and section 300, subdivision (b)(1). In doing so, the court rejected mother's theory that the December 15, 2021 incident was a one-time mental health crisis caused by her providers' erroneous prescription of Zoloft. Rather, the evidence proved mother had "longstanding mental health issues" as well as a history of making false statements, misreporting her own history, and ignoring medical recommendations for herself and minor. As such, the court found, the factors leading to the December 15, 2021 incident were "much more complicated and layered."

As to the section 300, subdivision (a) count, the court found the evidence established mother's conduct on December 15, 2021, was nonaccidental, as she intended to take the actions that placed minor at substantial risk of serious harm. In fact, she attempted to justify them. As to the section 300, subdivision (b)(1) count, the court found mother had longstanding serious mental health issues that had already put minor at serious risk of harm and were not currently ameliorated. While the testimony of Hernandez and Robinson may have supported a contrary finding, the court noted that both witnesses lacked complete knowledge of mother's diagnoses, symptoms, and medication and relied on mother for their information despite her history of withholding or providing false information.[5] The court also found Robinson's tone too defensive and adversarial for a dependency proceeding.

Thus, noting the lack of any plan that could ensure minor's safety prior to mother's undergoing a comprehensive mental health evaluation, the court

---

[5] The court referenced, among other things, mother's recent application for a restraining order against alleged father that contained "obviously[] false" information.

13

found by clear and convincing evidence that minor must be removed from her care and placed out of the home. The court also ordered a family reunification case plan, including supervised visitation for mother. Mother timely appealed the jurisdiction findings and disposition order.[6]

## DISCUSSION

Mother challenges the juvenile court's jurisdiction findings and disposition order. Mother insists the events of December 15, 2021, that endangered minor were solely the result of a mistaken prescription of Zoloft—a medication contraindicated for persons, such as herself, with bipolar disorder—that induced her manic episode. She further insists that by the time of the jurisdiction/disposition hearing, her medication had been corrected and she was stable and fully capable of caring for minor. Mother thus contends that substantial evidence failed to support the court's findings that (1) due to mother's mental health condition, minor faced a substantial risk of suffering serious physical harm (§ 300, subds. (a), (b)(1)) and (2) minor's removal from mother's custody was the only available means to protect minor's physical health (§ 361, subd. (c)(1)). We address these claims in turn *post*.

### I. Jurisdiction Findings (§ 300, subds. (a), (b)(1)).

Section 300, subdivision (a) requires proof that "the child suffered or is at substantial risk of suffering 'serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.' [¶] . . . [¶] . . . [S]ection 300, subdivision (b) requires proof that the child suffered or is at substantial risk of suffering 'serious physical harm or illness,

---

[6] In February 2023, we received letters from the parties regarding recent trial court proceedings and rulings. These recent trial court rulings do not impact the issues before us on appeal.

14

as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . .' " (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716–717, overruled in part on other grounds by *In re D.P.* (2023) 14 Cal.15 266, 278.)

As this language reflects, the scope of section 300, subdivision (a) and the scope of section 300, subdivision (b) overlap. " 'Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness. [¶] 'In determining what constitutes a substantial risk of serious physical harm, some general guidance may be drawn from subdivision (a) of section 300, which uses the same language to authorize jurisdiction where "[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent or guardian." For purposes of that subdivision, "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the minor or the minor's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm." (§ 300, subd. (a).)' (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 823 [citation], original italics.)" (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 399.) "Nonaccidental" generally means a parent or guardian "acted intentionally or willfully . . . ." (*In re R.T.* (2017) 3 Cal.5th 622, 629–630.)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may

consider past events in deciding whether a child presently needs the court's protection." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601–602; accord, *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561 [§ 300, subd. (b)(1) does not require that a parent commit neglect or deserve blame for being unable to supervise or protect the child, only that an actual inability to provide the necessary supervision or protection exists].)

We review the juvenile court's jurisdictional findings for substantial evidence. "In doing so, we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment. [Citation.] But substantial evidence 'is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] . . . "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." [Citation.]' [Citation.]" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

Here, the record contains substantial evidence upon which to sustain the dependency petition under both section 300, subdivision (a) and section 300, subdivision (b). Without wholly rehashing the evidence set forth *ante*, we find the following particularly probative of mother's "actual inability to provide the necessary supervision or protection" for minor. (*In re Joaquin C., supra*, 15 Cal.App.5th at p. 561.) First, mother, diagnosed with both schizophrenia and bipolar disorder, has a documented history of rejecting professional advice from her and minor's healthcare providers. This includes, inter alia: (1) refusing to enter the hospital prior to minor's birth after being diagnosed with preeclampsia, a condition that placed her and minor at risk;

(2) leaving the hospital against medical advice after minor's birth, without undergoing a recommended psychiatric evaluation or scheduling a follow-up appointment to address minor's heart condition; (3) rejecting test results indicating that she had herpes and declining herpes treatment for minor; (4) refusing to undergo substance abuse treatment or testing after self-reporting use of alcohol and marijuana to tame her anxiety; and (5) remaining unreachable to her mental health providers for extended periods of time.

Second, mother directly placed minor at risk of serious physical harm through her actions on December 15, 2021, when she, among other things, drove a stolen car with minor on her lap until the car became stuck on train tracks. At that point, mother abandoned the car and, in 40-degree weather, carried minor, dressed only in a onesie with a soiled diaper, to a bar, where she spoke nonsensically and denied knowing minor's identity. Mother further endangered minor by admittedly giving minor Mucinex whenever she left the house, despite the fact that Mucinex is contraindicated for children under age four. Another time, mother brought minor to the hospital, claiming minor was choking, could not breathe and was scheduled for heart surgery—none of which was true.

Lastly, the record supports the department and court's shared concern about mother's lack of insight into her mental health and how it interferes with her ability to provide adequate care for her young child. For example, while mother continues to blame the misprescription of Zoloft for the December 15, 2021 incident, substantial evidence demonstrates that she has longstanding, unresolved issues with debilitating anxiety and confused thinking. At the time of the contested hearing, mother needed help keeping track of her medications and regularly missed appointments for therapeutic

17

and medication services. Yet, she reported needing to take Seroquel upwards of three times a day—whenever she needed to " 'see people.' " She also reported that she feared leaving the house and had not driven for about a year, aside from, apparently, December 15, 2021, when she stole a car. And, most importantly, in multiple instances mother failed to disclose to her care providers accurate and complete information regarding her mental health history, including her prescribed medications and bipolar disorder and schizophrenia diagnoses.

This record undermines mother's claims that her mental health had stabilized by the time of the jurisdiction/disposition hearing such that she could safely care for minor. It also provided the juvenile court a proper basis for concluding that minor continued to face a substantial risk of serious physical harm inflicted nonaccidentally and that mother required a more comprehensive mental health evaluation and treatment plan before minor could safely return to her care. The law is clear: "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may consider past events in deciding whether a child presently needs the court's protection." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165–166; cf. *In re Joaquin C., supra*, 15 Cal.App.5th at p. 562 ["agency did not produce evidence that [mother] had ever failed to adequately supervise or protect [minor]; that she had ever failed to provide him with adequate food, clothing, shelter, or medical treatment; or that she had ever demonstrated an inability to provide regular care to him because of her mental illness"].) Accordingly, the court's jurisdiction findings stand.

## II. The Removal Order (§ 361, subd. (c)(1)).

"Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. ([Citation]; § 361, subd. (c)(1).) There must be clear and convincing evidence that removal is the only way to protect the child." (*In re N.M., supra,* 197 Cal.App.4th at p. 170.) "On review, we employ the substantial evidence test, however bearing in mind the heightened burden of proof." (*In re Kristen H.* (1996) 46 Cal.App.4th 1635, 1654.) As the California Supreme Court instructs, "when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

"California dependency laws 'establish that out-of-home placement is not a proper means of hedging against the possibility of failed reunification efforts, or of securing parental cooperation with those efforts. It is *a last resort*, to be considered only when the child would be in danger if allowed to reside with the parent.' " (*In re M.V.* (2022) 78 Cal.App.5th 944, 959.)

Mother argues that the department and juvenile court's reasons for ordering minor's removal were not supported by clear and convincing evidence of a risk of serious physical harm to minor and that the department and juvenile court failed to offer adequate alternatives that would have obviated the need for removal. In doing so, mother directs us to cases where the reviewing court reversed a removal order upon concluding the parent could receive necessary treatment for the problems that led to the

19

dependency while the child(ren) remained in the home. (E.g., *In re Henry V.* (2004) 119 Cal.App.4th 522, 525–527 [reversing removal order where the social worker acknowledged "services were available to support bonding in the home if Henry were returned, including a counseling program that comes to homes, unannounced visits, and public health nursing services"]; *In re M.V., supra,* 78 Cal.App.5th at p. 962 [reversing removal order where, inter alia, "[t]he social worker testified, without qualification: *'I can't think of any safety risk right now placing [the Children] with the father'* "].) Mother's cases are distinguishable.

The record here establishes the department took numerous steps to assess whether minor could safely reside with mother while mother received services before ultimately concluding minor could not. These steps included exhaustively investigating mother's mental health history; interviewing her many health care and other service providers; conducting a team meeting for mother with her supporters; and referring her to services for, among other things, substance abuse, parenting and mental health.

The juvenile court, in turn, considered all of this evidence before reasonably concluding that given minor's extremely young age, more needed to be done, including a complete psychological evaluation of mother, to verify minor could safely remain in her care without facing a serious risk of physical harm. As the court aptly noted: "Parenting a young child is hard. It takes patience, fortitude, and a firm grasp of reality. Mother has serious mental health issues that need to be evaluated by a practitioner with access to all of her records. [¶] Placing a six-month-old child with mother until that evaluation is made and adequately addressed is the definition of substantial risk."

Accordingly, we conclude there is substantial evidence from which a reasonable fact finder could have found it highly probable that removing minor from mother's care was necessary to protect the child from a continuing risk of physical harm, and that there was no reasonable alternative to her removal. (*Conservatorship of O.B., supra*, 9 Cal.5th at pp. 995–996.)

## DISPOSITION

The juvenile court's jurisdiction findings and disposition order are affirmed.

_____

Jackson, P. J.

WE CONCUR:

_____

Simons, J.


_____

Wiseman, J.*


A164998/*Marin County Dept. of Health and Human Services v. Tiffany K.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.